**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **JOHN DOE** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | **Civil Action No. _____** |
| | § | |
| **AUSTIN COLLEGE**, | § | |
| **TIM MILLERICK**, as agent for Austin | § | |
| College, **SHEILA PINERES,** as agent for | § | |
| Austin College, and **MICHAEL DEEN**, as | § | |
| agent for Austin College**,** | § | |
| | § | |
| **Defendants.** | § | |

---

### PLAINTIFF JOHN DOE'S ORIGINAL COMPLAINT

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES Plaintiff John Doe[1] and files this Original Complaint against Defendants

Austin College, Tim Millerick, Sheila Pineres, and Michael Deen, seeking a declaratory judgment

and injunctive relief, *inter alia*, for (i) breach of contract, (ii) reverse discrimination in violation of

20 U.S.C. § 1681, *et seq*. ("Title IX"), and (iii) deprivations of his constitutional due process rights

in violation of 42 U.S.C. § 1983, and in support of which would respectfully show the honorable

Court and Jury as follows:

### I.
### STATEMENT OF THE CASE

1.     The action now before this Court is based on constitutional due process, reverse

discrimination under Title IX, and related state law causes of action brought on behalf of Plaintiff

---

[1] Plaintiff files with this Original Complaint his Motion to Proceed Under Pseudonym.

John Doe (hereinafter, "Plaintiff" or "John Doe"), a now-former Senior at Austin College, who was suspended and *de facto* convicted of raping of a fellow senior, without any witnesses or evidence whatsoever, mere weeks before graduation.

2.      In the face of potentially severe and inflammatory negative publicity and/or an investigation at the hands of the Department of Education, Office of Civil Rights ("OCR"), Austin College has effectively denied male students their rights to due process and fair investigation and adjudication of sexual misconduct and related complaints. Indeed, for example, one need look no further than the OCR's 2015 investigation into Texas A&M University's disciplinary processes and procedures and/or the investigation of Baylor University in 2016 for its deplorable handling of several Title IX cases, which ultimately became an international scandal.

3.      Against the backdrop of these investigations and the present #MeToo Movement, the Time's Up Movement, among many others, Austin College treated John Doe in a manner inconsistent with Austin College's own policies and procedures, stripping John Doe of his rights to a fair and just investigation and adjudication process.

4.      Despite having properly filed a complaint of false rape allegations and harassment against Jane Roe with Defendant Dean of Students Michael Deen on October 14, 2017, no representative of Austin College made *any* contact with Plaintiff John Doe until Jane Roe filed a sexual assault/ rape complaint against John Doe several days later.

5.      During a meeting with Defendant Tim Millerick, Vice President of Student Affairs & Title IX Coordinator, on October 19, 2017, John Doe discovered that, despite having lodged his harassment complaint against Jane Roe days prior, it would, in fact, be Jane Roe who was considered "the reporter" by Austin College in its investigation of sexual assault/ rape claims against him. No investigation was opened in the reverse.

6.     Thereafter, Defendants failed to conduct adequate, reliable, and impartial investigations and/or student misconduct hearings. In fact, in the days leading up to John Doe's student misconduct hearing, Mr. Millerick (i) essentially accused John Doe of attempting to frame Jane Roe in the proceedings, (ii) promised to have a medical doctor present to contextualize medical records that Mr. Millerick submitted to the hearing Council—and then failed to do so, (iii) purposefully suppressed Jane Roe's documented, misdemeanor assault of John Doe on-campus four days before the misconduct hearing, and (iv) failed to investigate and/or prosecute Jane Roe's two false allegations that John Doe had violated their "no-contact order," accusations which Mr. Millerick understood to be provably false, in addition to many other misgivings.

7.     Ultimately, Defendants reached the erroneous conclusion that Plaintiff had engaged in sexual assault/ rape of Jane Roe at an off-campus location, despite a fundamental dearth of evidence and/or witness  testimony to  support  Jane  Doe's  claim and, in fact, in direct contravention of existing witness testimony to the contrary. Severe sanctions were imposed against Plaintiff, including, but not limited to, *de jure* suspension from Austin College and *de facto* dismissal from the Austin Teacher Program.

8.     Defendants indicated a bias against male students when Defendants investigated and adjudicated allegations against Plaintiff John Doe in a manner and degree materially different than their investigation and adjudications of allegations made against Jane Roe by Plaintiff. Specific instances of bias included, but were not limited to, Defendants' failures to investigate and/or hold misconduct hearings regarding: (i) John Doe's complaint of harassment against Jane Roe; (ii) Jane Roe's multiple and provably false allegations that John Doe had violated the no-contact order during the pendency of the sexual assault investigation; and/or (iii) Jane Roe's misdemeanor

assault of John Doe on campus mere days before the student misconduct hearing, as documented by the Austin College Police Department, in true violation of the no-contact order.

9.      While Plaintiff was (i) restricted from classes and nearly all Austin College facilities during the pendency of the disciplinary process, (ii) required to inform campus police of his whereabouts/ request police escort to move around campus, and (iii) use Skype to attend his Education class by video, among other restrictions, Jane Roe was able to attend classes in person and move around campus unaccompanied/ unescorted. Furthermore, in direct contravention of the Department of Education's September 2017 "Q&A on Campus Sexual Misconduct," Defendants pressured John Doe into an inequitable non-disclosure arrangement for the pendency of the investigation.

10.     In erroneously deciding that Plaintiff engaged in sexual assault in violation of Austin College's Title IX policy and Student Handbook, Defendants relied on prejudicial assumptions and intentionally disregarded an egregious dearth of evidence that would not meet *any* proper evidentiary standard—*preponderance of the evidence or otherwise*.

11.     At all times, Plaintiff was tragically deemed guilty. Consequently, Plaintiff was suspended from Austin College through, at least, December 31, 2018, or until such time as "the reporter," Jane Roe, is no longer enrolled, whichever is longer. This extreme and severe sanction was not warranted in light of the lack of any evidence and the insurmountable procedural misgivings created by Defendants.

12.     Defendants Austin College, Tim Millerick, Sheila Pineres, and Michael Deen conducted a procedurally flawed investigation and adjudication process, leading to an erroneous outcome and an unduly severe, disproportionate sanction as a result of anti-male discriminatory bias, in violation of Title IX, *inter alia*.

## II.

### PARTIES

13.   Plaintiff John Doe (hereinafter, "Doe") is a natural person and citizen of the United States and resident of Sherman, Texas, where he was an undergraduate student at Austin College. John Doe resides in Sherman, Texas.

a.   At the time of Doe's Title IX disciplinary hearing on February 23, 2018, he was approximately 79 days from graduating with his Bachelor's Degree in Physics.

b.   The disclosure of John Doe's identity will cause the student irreparable harm, as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232(g); 34 CFR Part 99.

14.   Defendant Austin College is a private, liberal arts college receiving federal funds in Sherman, Texas, and may be served with process at 900 N. Grand Avenue, Sherman, Texas 75090.

15.   Upon information and belief, Defendant Tim Millerick ("Millerick") is a resident of the State of Texas and the Vice President for Student Affairs at Austin College in Sherman, Texas. Tim Millerick may be served with process through his place of employment at 900 N. Grand Avenue, Sherman, Texas 75090.

a.   On information and belief, Millerick has been acting under the policies, procedures, and practices of Austin College and, in particular, those policies designed to implement Title IX.

b.   Millerick is responsible for administering and operating the Austin College student handbook known as "The Environment."

16.   Upon information and belief, Defendant Sheila Pineres ("Pineres") is a resident of the State of Texas and the President of Academic Affairs for Austin College in Sherman, Texas. Sheila

Pineres may be served with process through her place of employment at 900 N. Grand Avenue, Sherman, Texas 75090.

      a.  On information and belief, Pineres has been acting under the policies, procedures, and practices of Austin College and, in particular, those policies designed to implement Title IX.

      b.  Pineres is responsible for administering and operating the Austin College student handbook known as "The Environment."

17.    Upon information and belief, Defendant Michael Deen ("Deen") is a resident of the State of Texas and the Dean of Students for Austin College in Sherman, Texas. Michael Deen may be served with process through his place of employment at 900 N. Grand Avenue, Sherman, Texas 75090.

      a.  On information and belief, Deen has been acting under the policies, procedures, and practices of Austin College and, in particular, those policies designed to implement Title IX.

      b.  Deen is responsible for administering and operating the Austin College student handbook known as "The Environment."

### III.
#### JURISDICTION AND VENUE

18.    The action *sub judice* arises out of the decision of Austin College to impose disciplinary sanctions, including, but not limited to, discriminatory sequestration and suspension, against Plaintiff John Doe in violation of his herein-described constitutional and statutory rights. Austin College receives federal financial assistance and, therefore, is subject to the dictates of 20 U.S.C. § 1681, *et seq*.

19.     The action *sub judice* arises, in part, from and under the laws of the United States and the United States Constitution, *inter alia*, as a result of Defendants' denial of Plaintiff John Doe's due process rights in violation of 42 U.S.C. § 1983, breach of contract, and sex/ gender discrimination in violation of Title IX. Indeed, Austin College made the decision to impose disciplinary sanctions, including, but not limited to, discriminatory sequestration and expulsion, against Plaintiff John Doe in violation of his herein-described constitutional and statutory rights.

20.     Accordingly, this Court has jurisdiction over the merits of this action pursuant to 28 U.S.C. §§ 1331 and 1343, as well as Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

21.     The injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

22.     Venue is proper in the Eastern District of Texas, Sherman Division, pursuant to 28 U.S.C. 1391(b), as a judicial district in which the parties hereto are residents and a substantial part of the events and/or omissions giving rise to the claims herein occurred.

## IV.
### STATEMENT OF FACTS

23.     Following years of criticism for being too lax on campus sexual assault, colleges and universities across the United States are relying on Title IX to crack down on alleged perpetrators. Unfortunately, this crackdown has gone too far, and innocent young men, in particular, have seen their lives and livelihoods shattered by unsubstantiated and erroneous allegations of sexual assault. Chief among these issues is the fact that the accused students are, effectively, presumed guilty until proven innocent. Instead of requiring accusers to prove that they were sexually assaulted, the accused students have to prove that they, in fact, had consent. In making this determination, universities and colleges are applying the very lowest standard of proof—preponderance of the evidence.

### A.  THE APRIL 2011 "DEAR COLLEAGUE LETTER" AND DOE OFFICE FOR CIVIL RIGHTS

24.     In April 2011, the United States Department of Education, Office for Civil Rights issued a "Dear Colleague Letter" to colleges and universities. The Dear Colleague Letter indicated that colleges and universities receiving federal funds must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct in order to be in compliance with Title IX's mandates.

25.     Most notably, the Dear Colleague Letter required schools to adopt a relatively low "more likely than not" burden of proof in cases involving sexual misconduct, including sexual assault. Prior to the 2011 Dear Colleague Letter, several colleges were using a "clear and convincing" standard, and some, such as Stanford University, applied the criminal standard of "beyond a reasonable doubt."

26.     Pertinently, the 2011 Dear Colleague Letter states that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing. The Dear Colleague Letter, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy. To that end, the Dear Colleague Letter states that schools should give both parties the right to appeal a decision, which effectively amounts to double jeopardy for an accused student. After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures, including Austin College.

27.     In pursuit of Title IX enforcement, OCR has been pressuring colleges and universities to aggressively pursue investigations of sexual assaults on campuses and has opened investigations into Texas schools, such as Texas A&M University and Baylor University, among others.

28.     The Dear Colleague Letter was a step in the increased enforcement of Title IX regulations on colleges and universities. Indeed, NPR described the Dear Colleague Letter as the government's "first warning shot."[2] The Washington Post reported in March 2015 that the Department of Education OCR was seeking to hire up to 200 more investigators. Under pressure from victims advocacy groups, the federal Department of Education disclosed for the first time the names of colleges—totaling 55—under investigation for possible violations of federal rules aimed at stopping sexual harassment.

29.     As of February 1, 2017, the federal government had active investigations into 306 institutions of higher education and slews of closed investigations, including notable schools such as the University of Cincinnati, the University of Miami (Florida), Berkeley College, Stanford University, Harvard University, Brown University, Columbia University, Cornell University, Dartmouth College, Johns Hopkins University, the University of Chicago, Baylor University and Texas A&M University.

30.     In February 2014, Catherine E. Lhamon, the Assistant Secretary for Civil Rights who led the DOE OCR, told college officials at a conference at the University of Virginia that schools need to make "radical" changes. According to the Chronicle of Higher Education, college presidents suggested afterward that there were *"crisp marching orders from Washington."*[3] Lhamon was quoted in the Los Angeles Times, stating, *"We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward."*[4]

---

[2] *How Campus Sexual Assaults Came To Command New Attention*, NPR (Aug. 12, 2014).
[3] *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, CHRONICLE OF HIGHER EDUCATION, February 11, 2014.
[4] David G. Savage and Timothy M. Phelps, *How a little-known education office has forced far-reaching changes to campus sex assault investigations,* LOS ANGELES TIMES (Aug. 17, 2015).

31.     In September 2014, the Chronicle of Higher Education noted: *"Colleges face increasing pressure from survivors and the federal government to improve the campus climate."*[5] In the same article, the Chronicle noted that different standards were applied to men and women during investigations of sexual assault allegations, finding:

> *Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent.*

32.     At a national conference at Dartmouth in Summer 2014, Lhamon was quoted, stating, *"I will go to enforcement, and I am prepared to withhold federal funds."*[6] In that same article, Anne Neal of the American Council of Trustees and Alumni was quoted, saying, *"There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think."* Ms. Neal explained that schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead.

33.     In June 2014, Lhamon told a Senate Committee, *"This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ."* She further told the Committee that if OCR could not secure voluntary compliance from the funding recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher

---

[5] *Presumed Guilty: College men accused of rape say the scales are tipped against them,* CHRONICLE OF HIGHER EDUCATION (Sept. 1, 2014).
[6] *How Campus Sexual Assaults Came To Command New Attention,* NPR (Aug. 12, 2014).

education. OCR has not had to impose this severe penalty on any institution recently because enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, non-discriminatory environments.

34.    Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. *"I expect that that can't help but be true,"* said Mr. Dana. *"Colleges and universities are getting very jittery about it."*[7] In fact, in May 2016, the National Association of College and University Attorneys published a research note urging colleges and universities to *"promptly destroy"* documents such as emails, staff notes, notes of hearing participants during a disciplinary hearing, drafts of hearing outcome reports, and other such working papers, all of which *"might actually prove very useful to a plaintiff's lawyer"* in a subsequent lawsuit and could contradict or undermine the single record the institution retains.[8]

35.    Furthermore, universities and colleges, including Austin College, have implemented trainings for investigators and Title IX personnel pushed by self-styled experts, such as Rebecca Campbell, a professor of psychology at Michigan State University, on the "Neurobiology of Trauma," or similar theories, where *"victims go into an extended state in which they can't speak or move, and hence cannot fend off an assailant."*[9] As quoted in The Atlantic on September 8, 2017:

> *Janet Halley, a professor at Harvard Law School, has written of the intended effect of the training on recipients: "It is 100% aimed to convince [investigators] to believe complainants, precisely* **when** *they seem unreliable and incoherent."*[10]

---

[7] Tovia Smith, Morning Edition, *Some Accused Of Sexual Assault On Campus Say System Works Against Them*, NPR (Sept. 3, 2014).

[8] R. Craig Wood, et al., *Between a Rock and a Hard Place: A Discussion of Issues that Frequently Arise in Sexual Misconduct-Related Litigation Against Colleges and Universities*, NACUA NOTES (May 18, 2016), *available at* http://counsel.cua.edu/res/docs/titleixlitigation.pdf.

[9] Emily Yoffe, *The Bad Science Behind Campus Response to Sexual Assault*, THE ATLANTIC (Sept. 8, 2017).

[10] *Id.* (bolded emphasis in original).

36.   The September 2017 Atlantic article further quotes Justin Dillon, a Washington, D.C., attorney who specializes in Title IX cases, saying:

> *'I don't think I've seen a complaint in the past year that didn't use the word frozen somewhere.' Trauma, he says, is used to explain away all inconsistencies in some complainants' accounts that would otherwise seem to contradict their having been assaulted. Schools do not make public the training materials of those who investigate and adjudicate sexual assault. But through lawsuits, Dillon has obtained some examples, and he says the assertions of the "neurobiology of trauma" that infuse these materials make it almost impossible for the accused to mount a defense. When such assumptions are held by those sitting in judgment, he says, 'how do you prove your innocence?'[11]*

37.   Furthermore, universities and colleges have taught and implemented trainings for investigators and Title IX personnel on the concepts of alleged victims experiencing "Tonic Immobility" and "Freezing," as if they are synonymous. However, the Atlantic writes:

> *'[I]t's not people acting like they're zombies'; they generally return swiftly to responsiveness. Liz Phelps, a professor of psychology and neural science at NYU, concurs. She cited the Atlanta Olympic bombing as an example. A video of the event shows that when the bomb went off, many in the crowd froze. But it was 'a momentary freeze before people started running. It's such a subtle response in humans that it's very hard to study,' she says.*
>
> *Tonic immobility might occur in people, but science hasn't definitively shown this yet. Even if it does occur, we cannot say with any certainty that it affects nearly 50 percent of sexual-assault victims, as Campbell claims is likely in her presentation. Tonic immobility's frequent precursors in prey animals—physical restraint combined with an imminent threat to life—do describe some instances of rape. But the conditions that lead to many sexual-assault complaints on college campuses—alcohol combined with miscommunication—do not fit this template.[12]*

---

[11] *Id.*
[12] *Id.*

38.     Elizabeth Loftus, a professor of psychology and social behavior at UC Irvine said that training for administrators on "Neurobiology of Trauma" *"sounded disturbingly like a return of 'recovered memory' theory, with some neurobiology thrown in 'to give luster' to the argument."* The Atlantic wrote, further:

> *Loftus also talked about the effects of drinking on memory. She said that with alcohol-induced memory fragmentation, attempts to reconstruct events are 'very vulnerable to post-event suggestion.' This can include someone, especially an authority figure, labeling a consensual act as rape. She said it's then easy for exaggerated, or even entirely false, memories to be created, ones that feel completely real. 'This is extremely worrisome,' she told me. 'The universities are under enormous pressure to do something about sexual assault, and they sometimes fill these offices with people whose bias and agendas lead them to create victimhood.'*

39.     Colleges and universities throughout the country, including Austin College, no doubt, are fearful of being sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). On information and belief, Defendant Austin College has taken these exact actions and destroyed records pertaining to the investigation and adjudication of John Doe's case.

40.     In April 2014, the White House issued a report entitled "Not Alone," which included a warning that if the OCR finds that a Title IX violation has occurred, the *"school risks losing federal funds,"* and that the DOJ shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. The Report further warned that if a voluntary resolution cannot be reached, the DOJ may initiate litigation. In July 2016, Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding.[13]

---

[13] Nick Visser, *Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault*, HUFFINGTON POST (July 4, 2016) ("The vice president said he'd like to take away federal funding from those universities.").

41.     On October 19, 2016, the OCR announced that it was opening an investigation into Baylor University's handling of Title IX cases. The investigation was reportedly prompted by a complaint filed by Baylor University's former Title IX Coordinator in September 2016, who resigned a week later amid allegations she made about senior leaders at Baylor University actively preventing full Title IX investigations. The OCR investigation and the resignation of Baylor's Title IX coordinator came over a year after students began to accuse Baylor University of mishandling alleged sexual assault cases.[14]

42.     When the Baylor University scandal broke, media outlets pointed to the fact that the U.S. Department of Education has the ability to terminate federal funds, and that although Baylor University is private school, it receives federal funding via student federal financial aid for tuition.[15] Upon information and belief, the Baylor University scandal and the investigation of Texas A&M University, among literally countless others, created a chilling effect among universities and colleges, particularly nearby schools within the state of Texas, like Austin College. Therefore, Austin College was reasonably aware that the circumstances at Baylor and A&M had shone a light on other schools for their handling of sexual assault cases and had the potential to produce negative publicity for Austin College.

43.     As of the date of this Complaint, the Trump Administration, whose Department of Education is headed by Secretary Betsy Devos, has not withdrawn the guidance in the Dear Colleague Letter. However, in September 2017, the DeVos DOE, Office of Civil Rights released a "Q&A on Campus Sexual Misconduct" that indicated the DOE's intent to issue new rulemaking

---

[14] Marc Tracy, *Baylor Under Federal Investigation Over Possible Title IX Violations*, NEW YORK TIMES (Oct. 20, 2016).
[15]     http://www.espn.com/college-football/story/_/id/17836024/us-department-education-launch-baylor-probe-title-ix-complaint

on the topic of schools' Title IX responsibilities in response to the over adjudication of sexual misconduct claims on university and college campuses.[16]

44.     In response to pressure from the #MeToo Movement, the OCR, DOJ, the Obama Administration, and the Trump Administration, educational institutions like Austin College have limited the procedural protections afforded to male students, like John Doe, in sexual misconduct cases in order to avoid the negative publicity and mainstream media hysteria that could result from appearing anti-victim.

   **B. JOHN DOE**

45.     Plaintiff John Doe is an Eagle Scout, a Physics major, and, by all accounts, an exceptional student and friend. Indeed, following nearly 10 years of experience as an outdoor retail manager, John Doe left his career at the age of 27 to pursue his dream of attaining a college education. Over the next two and a half years, John Doe worked at a blistering pace to complete 37 courses, and he was slated to graduate from Austin College with a Bachelor's Degree in Physics in May 2018.

46.     John Doe received the Boy Scouts of America's ("BSA") Heroism distinction for performing, albeit unsuccessfully, CPR on his father, following a horrendous car wreck involving his family. In addition, John Doe was also a member of BSA's National Honor Society as a second-level "Brotherhood" member. In high school, John Doe participated in band, where he was a member of the State Championship winning band, the Academic Quiz League, and the International Baccalaureate program, although he missed the degree distinction by one point.

47.     While taking general courses at North Lake College in preparation for attending Austin College, John Doe made the Dean's and President's Lists with a 4.0 GPA, he was accepted into

---

[16] Department of Education, Office for Civil Rights, *Q&A on Campus Sexual Misconduct* (Sept. 2017).

the physics work-study program, Phi Theta Kappa, the National Society of Collegiate Scholars, and Mu Alpha Theta, the mathematics honor society.

48.     While at Austin College, John Doe was an officer and/or member in the Society of Physics Students, the Environmentally Conscious Organization of Students ("ECOS"), and Rho Lambda Theta. John Doe presented research at the Austin College Scholarship Conference, and was slated to present research on two different topics in Spring 2018. John Doe was awarded a Stephens Scholarship to study abroad during the January 2018 term, and he made the Dean's list during the Fall 2017 semester based on his GPA.

49.     During John Doe's time as a student at Austin College, he was accepted into the Austin Teacher Program ("ATP"). Through his participation in the ATP, John Doe was on track to earn a Master's Degree upon complete of three graduate courses during the 2017-2018 school year, three graduate courses during Summer 2018, and a one year, full-time teaching internship, beginning in Fall 2018. To that end, John Doe had already completed one graduate-level course, and he was enrolled in two more graduate courses for the Spring 2018 semester.

### C.   JOHN DOE AND JANE ROE BECOME FRIENDS AND BEGIN DATING

50.     Jane Roe and John Doe first met in their Spring 2017 Differential Equations (MATH 351) class at Austin College. However, on information and belief, Jane Roe dropped the class after suffering a concussion. During Fall 2017, Jane Roe and John Doe had Euclidean Geometry (MATH 319) and Education 475 together, where Jane Roe would intentionally take a seat next to John Doe every class until the incident.

51.     In or about September 2017, Jane Roe and John Doe participated in a hike at Eisenhower State Park, where they collected trash for the Austin College Environmentally Concerned Organization of Students ("ECOS"). During the hike, John Doe and Jane Roe talked and began to

"hit it off." Eventually, Jane Roe invited John Doe to attend an Austin College soccer game with her, as one of Jane Roe's roommates was on the team. However, John Doe was unable to attend because of a scheduling conflict.

52.     On Friday, September 16, 2017, Jane Roe and John Doe attended the same party, where Jane Roe became intoxicated on alcohol and marijuana. Understanding that Jane Roe was in no state to drive, John Doe drove her home safely. The next day, Jane Roe sent John Doe a text message, thanking him for driving her home and stating, *"one who doesn't smoke should never smoke."*

53.     On or about September 21, 2017, John Doe invited Jane Roe over to a friend's dormitory/ college-supplied apartment to watch a hockey game, but she accidentally fell asleep, apologizing the next morning.

54.     On Sunday, September 24, 2017, Jane Roe invited John Doe over to her house to do homework together. After some time at her house, Jane Roe asked John Doe if he would drive her to pick up some medicine, which he did gladly. Afterward, Jane Roe stated that she wanted to take a nap, so John Doe left. When Jane Roe awoke from her nap, she invited John Doe to come back over to her house around approximately 7:00 pm. That evening, Jane Roe bought them dinner and they watched TV shows together, after which John Doe went home.

55.     By Friday, September 29, 2017, John Doe finally worked up the courage to ask Jane Roe if she would have dinner with him, and she seemed very enthusiastic in response. In addition, John Doe and Jane Roe agreed that he would attend the Van Alstyne homecoming with Jane Roe, where Jane Roe was student-teaching.

56.     As such, on Friday, September 29, 2017, John Doe drove to Jane Roe's house in Sherman, Texas, to pick her up for dinner. When he arrived, John Doe found Jane Roe dressed beautifully

in a white dress with a pattern throughout the fabric. However, John Doe accidentally locked his keys in his car, so they watched The Office at Jane Roe's house until AAA could arrive to unlock the vehicle.

57.     After AAA recovered his keys and feeling embarrassed, John Doe told Jane Roe that he entirely understood if she did not want to get dinner anymore. However, Jane Roe said that she absolutely wanted to get dinner with him, so Jane Roe and John Doe went to the Old Iron Post in Sherman, Texas, where Jane Roe could order food that would not agitate her alleged gluten intolerance. Following dinner, Jane Roe and John Doe returned to her house and cuddled while they watched approximately three episodes of The Office. When Jane Roe decided to go to bed, John Doe left her house and went to a party with his friends. It was around this time that John Doe first began to tell his close friends that he was "going out" with Jane Roe.

58.     The next day, September 30, 2017, Jane Roe text John Doe to say, *"Last night was really fun,"* to which John Doe responded, *"I thought so too. Thanks for being patient with the whole locking my keys in the car thing."* Jane Roe responded, *"Haha it was fun watching the office and chilling. Not gonna lie, seeing my students and teacher at hoco might have been aw[kward]."*

59.     On Wednesday, October 4, 2017, a friend sent a text message to John Doe's group chat, stating that the local Applebee's was offering significantly discounted margaritas on Wednesdays as a promotion. From their extensive conversations, John Doe knew that Jane Roe liked to drink tequila because it did not agitate her alleged gluten intolerance. Seeing this as the perfect opportunity to introduce her to his friend group, John Doe invited Jane Roe to join his friends at Applebee's that evening. Jane Roe accepted John Doe's invitation and joined him at Applebee's, where they stayed for several hours and belatedly celebrated a friend's 21st birthday.

60.     During the celebration at Applebee's, Jane Roe agreed to attend a hockey game with John

Doe and enthusiastically made preliminary plans for everyone to attend a game together. While at

the restaurant, Jane Roe sent John Doe a text message to say that he should come over to her house

afterward to study. Also during the celebration, John Doe received a text message from S.B., whom

John Doe had no yet met in person, regarding an upcoming alumni event. When Jane Roe saw

S.B.'s name appear on John Doe's phone, she quickly asked, *"Why are you talking to him? I hate*

*him."* Surprised by her reaction, John Doe told Jane Roe that he didn't really know S.B. personally,

as they had only ever exchanged a few text messages regarding the alumni event.

61.     During the dinner, Jane Roe sent a text message to John Doe, saying, *"Sorry. I don't mean*

*to be on my phone. My friend called me this morning and told me she was sexually assaulted…yea.*

*Awkward. So I'm talking to her."* Approximately 25 minutes later, Jane Roe text John Doe to ask,

*"Wanna work on lesson plans and grading and stuff after this[?],"* to which John Doe responded,

*"Yessss."*

62.     John Doe and Jane Roe eventually left Applebee's at approximately 7:30 pm. After John

Doe drove his friends home safely, he drove to Jane Roe's house, where they proceeded to watch

The Office together and cuddle. After approximately an episode and a half, Jane Roe and John

Doe began making out. Eventually, they began to remove some clothing and John Doe moved to

unclasp Jane Roe's bra. However, feeling nervous, John Doe struggled to get the clasp to unfasten.

63.     Sensing John Doe's embarrassment, Jane Roe eventually removed her bra and shirt after

some struggling with the clasp. After grinding their bodies together and making out for some time,

John Doe moved to remove Jane Roe's pants, but she stopped him by moving his hand away.

Thereafter, Jane Roe and John Doe continued to make out and rub their bodies together.

64.     Eventually, Jane Roe put her hand up in a sign that she wanted to stop. John Doe immediately stopped in accordance and asked, *"Do you want to stop?"* Jane Roe responded, *"Yes,"* and John Doe stopped. Following a few awkward moments, John Doe asked, *"Do you want me to leave?"* Jane Roe said, *"Yes,"* so John Doe agreed to leave. After John Doe got dressed, he walked to the front door of Jane Roe's house to leave, but she stopped him in the doorway and said, *"I'm sorry. Thank you for stopping."* John Doe immediately thanked her for stopping him and told her that she should not have to feel like thanks were necessary. Jane Roe then kissed John Doe goodbye, and he left her house.

65.     After leaving Jane Roe's house, John Doe drove to meet up with a friend and his girlfriend because the friend had accidentally left his backpack in John Doe's car that evening. When they met up, John Doe told them about what had happened with Jane Roe. Although they found Jane Roe's behavior to be a little odd, John Doe's friends told him that he did the right thing by clearly communicating with Jane Roe regarding her feelings.

66.     When John Doe returned to his car, he discovered that Jane Roe had accidentally left her keys in his car, as well. As such, John Doe sent a text message to Jane Roe about her keys, and Jane Roe noted, in response, that she had accidentally left her wallet in his car, as well. Later that night, John Doe dropped Jane Roe's keys and wallet in her mailbox and sent her a text message to let her know.

67.     On Thursday, October 5, 2017, Jane Roe sent John Doe a text message to apologize for her awkward behavior, and he told her that it was no problem. On information and belief, Jane Roe left that evening to attend Austin City Limits for the larger part of Austin College's Fall Break. John Doe went to New Orleans for Fall Break. Over the weekend and through Fall Break, Jane

Roe and John Doe sent each other abundant and constant text messages, staying in touch nearly the entire time.

68.    On the final Sunday of Fall Break, October 8, 2017, Jane Roe insisted that she and John Doe get together, so they made plans to hang out at John Doe's house. Jane Roe brought her dog over, and they let their dogs play together in John Doe's backyard. Afterward, John Doe and Jane Roe went inside the house and turned on The Magic School Bus while they did homework for approximately an hour.

69.    After some time, Jane Roe told John Doe that she wanted to talk before she left. John Doe obviously obliged, and Jane Roe expressed to him in quite ambiguous terms that something had happened to her at a previous college, which was why she transferred to Austin College, stating, *"What you probably think happened to me happened to me."* As an autistic individual, John Doe was not certain how to respond, so he said, *"Okay, is there anything else you want to share with me?"* Jane Roe told him that was all, and she thanked John Doe for allowing her to share. After this talk, Jane Roe retrieved her dog, packed her things, and left John Doe's house.

70.    On Tuesday, October 10, 2017, Jane Roe and John Doe continued to chat and text message each other, and Jane Roe suggested that they go see a movie together that night. John Doe had to do research for work until 8:30 pm, so they planned to see a movie at approximately 10:30 pm. Unfortunately, later that day, John Doe's professor needed him to stay in the lab and collect data until Midnight, so John Doe apologized to Jane Roe for having to cancel their plans. John Doe, ultimately, did not get to bed until approximately 3:00 am the next morning.

71.    On Wednesday morning, October 11, 2017, John Doe sent a text message to Jane Roe, apologizing for having to cancel their plans, and asked if they could plan another date. Jane Roe said she was doing fine, but she had a severe headache. Feeling bad for Jane Roe, John Doe

proceeded to buy her a chocolate bar, which he had always understood to be beneficial in alleviating headaches. Jane Roe then met up with John Doe at his physics laboratory, where he gave her the chocolate bar and they worked on homework together for some time.

72.     While we were doing homework together, Jane Roe excitedly said that they should go to Applebee's again for discount margaritas, as it was now their *"Wednesday tradition."* John Doe told Jane Roe that he was exhausted after working very late, but he begrudgingly agreed after Jane Roe badgered him for a few minutes, acknowledging that he needed to eat dinner anyway.

73.     Accordingly, John Doe began to text message his friends about going to Applebee's. Eventually, John Doe got a group on-board to hang out at Applebee's that afternoon/ evening for dinner and drinks. However, they agreed as a group to leave around 6:30 pm, as many in the group had homework and/or wanted to get sleep. Later that day, John Doe picked up his friends one by one, and then drove to pick up Jane Roe from her house. When John Doe told Jane Roe that he was outside of her house, she told John Doe to hold up because she needed to finish her glass of wine.

74.     At Applebee's, most of the group drank margaritas and ate food, and Jane Roe eventually ordered Jell-O shots for the group. Jane Roe drank approximately three margaritas, while John Doe had two. Around 6:30 pm, someone asked what whether there was a plan for after dinner, to which John Doe responded that he needed to go home and nap before staying up all night for homework.

75.     As John Doe said this, Jane Roe sent him a private text message, asking what she and John Doe were going to do after dinner. Sensing that she wanted to be alone with him, John Doe told Jane Roe that she could come over to his house with her dog and study, saying, *"That's up to you."* Jane Roe responded, *"I think that sounds like a good plan :)"*, and she then began to press John

Doe to have another friend take everyone home so that they could leave alone. After John Doe

made those arrangements, John Doe and Jane Roe went to his car, where she applauded his ability

to shake off his friends.

76.      When John Doe and Jane Roe arrived at his house on the evening of Wednesday, October

11, 2017, they let John Doe's dog out in the backyard and then meandered their way into John

Doe's house, where she became curious about some of the pictures hanging next to his bedroom

door. After John Doe explained the photographs to Jane Roe, she asked him what he wanted to do

next. In response, John Doe told her that he was serious about taking that nap. Jane Roe then said

that she wanted to take a nap with him.

77.      John Doe and Jane Roe then climbed into his bed, and John Doe turned on Netflix, offering

to let Jane Roe pick a show to watch. She declined, so John Doe turned on Friends. After the show

had been on for a few minutes, Jane Roe rolled over to John Doe and engaged in kissing him. They

commenced making out for some time before Jane Roe and John Doe removed their clothing,

including her shirt. Jane Roe began to grind her body very aggressively against John Doe, and she

pulled him in to her very closely. This continued for an extended period of time, during which,

John Doe nearly fell asleep from exhaustion.

78.      While Jane Roe was aggressively grinding on John Doe and they were making out, John

Doe's roommate accidentally opened the door to John Doe's room and witnessed the pair being

sexually intimate. John Doe's roommate then quickly shut the door.

79.      Eventually, Jane Roe and John Doe unbutton her pants, fumbling along the way, and she

grabbed John Doe's hand, shoving it down the front of her pants onto her vagina. However, John

Doe did not penetrate Jane Roe digitally. Jane Roe continued to moan and mumbled something

John Doe did not understand, so he asked what she said. Jane Roe spoke up and responded, *"It's okay, just be careful."*

80.     While Jane Roe and John Doe continued with the consensual sexual touching, Jane Roe unfastened John Doe's belt and reached into his pants, grabbing my penis with her hand. Thereafter, John Doe said to Jane Roe, *"I want to be inside you,"* and he removed his pants completely. With John Doe's pants fully removed, Jane Roe grabbed his penis and physically pushed his penis in her vagina. They did not use a condom. Not long after vaginal intercourse began, however, John Doe's penis fell out of her. He reinserted myself, and it came out again. At that point, Jane Roe inserted my penis in her vagina and held it in place.

81.     However, due to his extreme embarrassment, nervousness, and exhaustion, John Doe had a very difficult time ejaculating, which he eventually expressed to Jane Roe. In response, Jane Roe attempted to comfort him saying, *"It's okay,"* and he expressed to her that he wanted to keep trying. As such, Jane Roe began to vigorously stimulate John Doe's penis and brought him to climax, at which point she strongly held his body against hers.

82.     Exhausted from lack of sleep and intercourse, John Doe continued to rest with Jane Roe on his bed for some time until the third episode of Friends had ended. As they laid on the bed, John Doe asked Jane Roe how she felt, and she responded that she felt good. He then asked Jane Roe about her headache and whether it had subsided. In response, Jane Roe said that the headache was gone and that the medicine she had taken was "a good drug." This was the first time that Jane Roe mentioned taking any medication to for her headache to John Doe.

83.     They continued to rest on John Doe's bed until she said, *"Hey, we both have things we need to do."* John Doe responded, *"I know, but I'm still tired and I am comfortable with you here."* After a little while longer, John Doe and Jane Roe got out of bed and dressed together. Jokingly,

John Doe said to her, *"This should be included in our Wednesday tradition."* Jane Roe laughed in response and said, *"You would say that after sex."* John Doe then told her that he's actually more likely to bring up something like Star Trek after sex, in a nod to his nerdy interests. They then exited his room, still chatting and laughing, which John Doe's roommate attested he heard.

84.     Thereafter, John Doe drove Jane Roe home. When they got to her house, Jane Roe kissed John Doe goodbye and he left.

85.     The next day, Thursday, October 12, 2017, John Doe became worried when he did not hear from Jane Roe, as she did not respond to a message he sent in their group chat. Around 12:49 pm that day, John Doe text Jane Roe, saying, *"Hey [T.S.] just texted me concerned that you weren't at his class today, and honestly I'm a little concerned that I haven't heard from you. Not to be dramatic, I hope that you're okay, I hope that we're okay."* Mere seconds later, Jane Roe responded, *"I just need some space."* Confused and emotionally distraught over this message, John Doe tried to maintain his calm and said, *"Okay."* That night, John Doe was extremely upset and felt blind-sided by her response, telling his friend, P.B., *"I don't know what's going on with Jane Roe, she just said that she needs space."*

86.     The next day, Friday, October 13, 2017, John Doe consulted with two friends, who told him that he needed to give it time. Indeed, John Doe's female friend said, *"Don't worry, nothing's wrong. A lot of things go through a girl's head when we have sex."* Thereafter, John Doe went to his physics laboratory, and then eventually to the homecoming festival, part of which was an event at "The Pub," a bar/ diner on the Austin College campus hosted by dining services, to see friends and to take his mind off of Jane Roe's strange behavior. At approximately 9:40 pm that night, Jane Roe sent a text message to John Doe, saying, *"I'm really angry with the way things went down."*

87.     Entirely blind-sided and emotionally disoriented by this text message, John Doe toiled over a response to Jane Roe's message that would be both empathetic and understanding, as he was very much interested in continuing a relationship with her. After agonizing over how to respond and consulting with his friend, P.B., at 9:51 pm, John Doe responded, *"I understand."* Thereafter, John Doe and Jane Roe had a phone conversation, where Jane Roe proceeded to say, *"You raped me. I told you 'no' the entire time we were having sex."* Horrified, John Doe unequivocally denied Jane Roe's heinous allegations and text her after their call, saying:

> *For the record you did not say those words, despite my agreeability, the last things you said to me were be careful, and it's okay. Not to be grotesque, but you started it, and you put it in. I am not going to let you make me feel bad about that. I feel terrible about making you feel anything less than the incredible person I think that you are. As I said I will be as amicable as I can on campus and in class so that no one suspects anything, and we can move on. Have a wonderful life [Jane Roe].*

88.     Following this conversation, John Doe text his friend T.S. to see if he could come over and talk about everything that had happened. T.S. had to usher people out of his house, as he was holding a party at the time, so John Doe went to the Physics laboratory and cried alone. When John Doe was able to speak with T.S. and his girlfriend, S.H., they encouraged him to file a complaint against Jane Roe with Austin College for harassment.

**D.  REPORT OF HARASSMENT AND TITLE IX INVESTIGATION**

89.     Disturbed by Jane Roe's false allegations and harassment, John Doe sent a complaint of harassment on October 14, 2017, to Defendant Michael Deen, Austin College Dean of Students, who was a "Responsible Employee" for redressing complaints under the Austin College Student Handbook. John Doe's final communication with Jane Roe was a text message the same day, informing her that, *inter alia*, a complaint had been filed.

90.     Two days later, on October 16, 2017, Jane Roe text John Doe: *"K, well you filed nothing. So let's try not lying about significant/important things. Thx."* The Austin College Student Handbook states on page 96, as follows:

> *False Accusations     A false complaint of sexual misconduct can place a permanent stigma on a member of the Austin College community, regardless of the outcome of an investigation. Therefore, false accusations are prohibited and are violations of College policy. The College reserves the right to redress through appropriate College protocol any complaint, accusation, or testimony found through an investigation to be brought in bad faith or knowingly false.*

91.     Despite having filed a formal complaint of harassment in accordance with the Student Handbook, John Doe was not contacted by *any* representative of Austin College until, Thursday, October 19, 2017, after Jane Roe had filed her own complaint against John Doe for sexual assault/ rape. During a meeting with Defendant Tim Millerick, Vice President of Student Affairs & Title IX Coordinator, on October 19, 2017, John Doe discovered that, despite having lodged his own harassment complaint against Jane Roe days prior, it would be Jane Roe who was considered "the reporter" in Austin College's investigation of sexual assault/ rape claims against John Doe.

92.     During this meeting, John Doe was informed by Millerick that, *"in order to insure the privacy and wellness/safety of both you and the reporter, I have put in place a no-contact order for you with the reporter."* Millerick told John Doe that *"if any violation of this no-contact order occurs, the College will consider it a violation of College policy and could consider taking more formal action regarding the matters we discussed."* Importantly, Millerick put in place a gag-order, instructing *"that the situation between [John Doe] and the reporter remain confidential among us."* Furthermore, because Jane Roe and John Doe had two rather small, upper-level classes together, John Doe was instructed *"to sit in the back of the room and/or some distance from her as best as possible."*

93.     During this meeting, John Doe was informed that he was entitled to an advisor/advocate to assist through the campus resolution process and that Austin College maintains "a group of non-attorney advisor/advocates from among the faculty and staff," specifically,  However, pursuant to the Austin College Sexual Misconduct and Harassment Policy and Procedures, John Doe's advocate/adviser could not speak and/or present at any time on his behalf—not even an attorney. Shockingly, Millerick, Austin College's Title IX Coordinator, demanded that John Doe declare his advocate *within 24 hours* of their meeting—a requirement distinctly absent from the above-mentioned policy, which requires disclosure of the advocate's identity at least two days before the date of John Doe's first meeting with investigators. Again, Millerick gave John Doe just 24 hours to find an advocate for the rape/ sexual assault proceedings that were initiated against him—this despite the fact that John Doe would not be contacted by investigators until weeks later on November 1, 2017.

94.     Distressed by the allegations and his 24-hour timeline to find an advocate, John Doe consulted with his friends, who suggested Dr. Brian Watkins, one of the designated faculty advocates at Austin College. Despite Millerick's hurried insistence that John Doe meet Millerick's arbitrary and exacting deadlines, John Doe was given no indication of how long the investigation and/or proceedings would take beyond a vague flow-chart.

95.     Again, it was not until November 1, 2017, that John Doe had his first meeting with the investigators, during which he detailed his relationship with Jane Roe, his account of the evening of October 11, 2017, and provided a list of individuals whom John Doe felt could serve as character and direct witnesses for the investigation.

96.     Also on November 1, 2017, John Doe was given a letter from Melanie Oelfke, Assistant Director of Human Resources, stating: (i) Millerick had requested that a formal investigation be

conducted relating to allegations that John Doe had violated standards of conduct; (ii) confidentiality is crucial and must be maintained during and after the investigation; (iii) *"retaliation against an individual who brings a complaint, participates in an investigation, serves in an investigative or hearing capacity will not be tolerated"*; and (iv) *"false claims or statements made to an investigator or other college agent by any individual before, during, or after an investigation or hearing will be subject to disciplinary action up to and including termination or expulsion."*

97.     On November 2, 2017, John Doe remembered the strange reaction that Jane Roe had when she saw Austin College alum S.B.'s name appear on John Doe's phone. On a hunch, John Doe reached out to S.B. and inquired as to why Jane Roe said she hated him. In response, S.B. sent John Doe an approximately five-minute long voice message, detailing prior experiences with Jane Roe and similar erratic behavior during physical intimacy. In these voice messages, S.B. described a personal experience where Jane Roe followed him home from the bar, asked if S.B. could show her his room, began to hook-up with S.B., and then panicked minutes after, later explaining that she had allegedly been raped at a previous university, which was why she transferred to Austin College. Despite the fact that S.B. had personally done nothing to upset Jane Roe, as she admitted, Jane Roe still hated S.B. after this interaction. Near the end of the voice message, S.B. was insistent that John Doe and the investigators get in touch with Jane Roe's roommate, J.S., for more information. Furthermore, S.B. mentioned another male student, E.P., who had a bad interaction with Jane Roe after she performed oral sex on him.

98.     Alarmed by these voice messages, John Doe immediately shared them with his faculty adviser, Dr. Watkins, who insisted that the recordings be given to the investigators as soon as possible. As such, Dr. Watkins and John Doe delivered the recordings to the investigators, Melanie

Oelfke and Keith Larey, Director of Human Resources, who said, *"Oh, man, this is very important. We need to call in [J.S.]. Can you get her information?"*

99.     During this meeting with investigators Larey and Oelfke, John Doe also provided screenshots showing that Jane Roe had continued to follow John Doe on social media; specifically, Jane Roe continued to follow and watch John Doe's posts on SnapChat. Investigators Oelfke and Larey indicated that they found this information to be very interesting, as Jane Roe was willingly watching videos posted by her alleged rapist; however, these screenshots were never admitted into the official investigation book. That afternoon, John Doe gave J.S.'s contact information to the investigators after J.S. sent it to John Doe on Facebook Messenger. At this time, John Doe understood that the investigators would interview S.B. and E.P. in order to flesh out a pattern of behavior with regard to Jane Roe's actions during physical intimacy.

100.     Over the next few weeks, John Doe attended classes and avoided contact with Jane Roe as much as possible. When Jane Roe and John Doe had classes together, John Doe was required to sit in the back of the room while Jane Roe sat in the front, which John Doe strictly adhered to. During this time, John Doe had approximately two instances where he and Jane Roe unintentionally passed each other on campus. During those instances, John Doe immediately attempted to avoid Jane Roe, as required by the "no contact" order; however, during the second instance, Jane Roe intentionally passed by John Doe to call him an *"asshole,"* which he ignored and carried on with his day.

101.     Austin College's Thanksgiving Break was during the week of November 19, 2017.

102.     On November 28, 2017, several weeks after his first interview with the investigators, John Doe was contacted by Millerick, who wanted to remind John Doe of the "no contact" order that was in place. During this meeting, Millerick accused John Doe of purposefully running into Jane

Roe around campus and muttering things to her as he passed. Shocked, John Doe unequivocally denied these allegations and felt very perturbed that Millerick was taking such an accusatory position, as he was supposed to be an unbiased arbiter. It appeared to John Doe that Millerick believed Jane Roe's allegations over John Doe's attestations, which made him very uncomfortable.

103.    The next morning, November 29, 2017, Millerick contacted John Doe to say that he was required to meet with him immediately that morning. When John Doe and Dr. Watkins arrived at Millerick's office, Millerick immediately questioned where John Doe had been the previous two evenings, November 27 and 28. Millerick went on to say that Jane Roe had accused him of yelling at her in the IDEA Center, asking why Jane Roe would not talk to him. Absolutely puzzled by these allegations, John Doe unequivocally denied these interactions and gave Millerick a description of his whereabouts and activities on those evenings.

104.    Millerick, however, disregarded John Doe's attestations and stated that, effective immediately, John Doe was banned from coming on campus and that he would have to use Skype to attend his classes from home. Millerick stated, further, that John Doe was not permitted to attend any of the meetings that John Doe had arranged with his professors on campus.

105.    Disturbed by these continuous, false allegations and Millerick's apparent bias against him, John Doe drafted a detailed timeline of his whereabouts with witnesses for the nights of November 27 and 28, at the suggestion of Dr. Watkins. Very shortly after the meeting with Millerick, John Doe emailed this detailed timeline to Millerick in order to prove his innocence, and he included the contact information of individuals who had been with him during the relevant time periods. On information and belief, Millerick contacted witnesses D.D. and C.R. to confirm John Doe's whereabouts, as D.D. sent a text message to John Doe afterward, asking about what was going on, and C.R. later asked the same in the hallway when he passed John Doe.

106.    By noon on the same day, November 29, 2017, Millerick contacted John Doe and partially reversed course, stating that John Doe could attend a meeting with Dr. David Baker on campus, but John Doe had to leave campus immediately after the meeting. Once again, John Doe was assumed by Millerick to be guilty until John Doe could prove his own innocence.

107.    Furthermore, John Doe explained to Millerick that he could not attend classes via Skype from home because of a poor internet connection and, beyond that, John Doe needed access to his research laboratories, computers, and specialized software in the workshop laboratory for his studies.

108.    Begrudgingly, Millerick stated that John Doe could work in the physics laboratory so long as John Doe checked-in with the campus police each time he moved around campus—as if John Doe was a violent criminal. Indeed, John Doe was required to notify the police each time he went to the laboratory, each time he went to the bathroom, and he had to be escorted by police to his vehicle when he left campus. On information and belief, Jane Roe was never subjected to such degrading and harsh restrictions of her freedom by Austin College, despite Millerick having knowledge that Jane Roe was lying with regard to violations of the "no contact" order.

109.    When John Doe met with Dr. David Baker for a scheduled meeting that day, Dr. Baker could tell that John Doe was extremely emotionally upset, so he took John Doe to see a counselor, stating that their meeting would continue at the counselor's office so that John Doe wasn't breaking Millerick's rules. At the counselor's office, John Doe described the emotional agony he was enduring, including the fact that he unfairly felt like a dangerous criminal, and the counselor was very concerned about Jane Roe's allegations and pattern of deceptive behavior.

110.    Around 5:30 pm on November 29, 2017, John Doe received a phone call from Millerick, who screamed at John Doe for, allegedly, not calling the police to inform them regarding his

whereabouts. Shocked and confused, John Doe explained that he had absolutely called the police and that he would be happy to provide Millerick with the phone records as proof. When John Doe went on to say that he had witnesses, including T.S., who could confirm his presence in the laboratory that evening, Millerick screamed through the phone, *"I don't care about your witnesses anymore!"*

111.   On Thursday, November 30, 2017, Millerick called John Doe into another meeting, where Millerick appeared to have calmed down to some degree. During this meeting, John Doe was instructed that he would be allowed to access campus again, however, John Doe would have to physically check-in with the police each time that he arrived and departed for the foreseeable future—again, as if John Doe was a violent criminal.

112.   On information and belief, it was not until December 2017 that the investigators first interviewed witnesses E.D., John Doe's roommate, T.S., S.H., A.M., B.L. and D.Y., who had attended dinner at Applebee's on October 11, 2017. These interviews took place during Austin College's Finals Week and approximately two months after the incident in question. By this point, however, the October 11, 2017, dinner at Applebee's was a largely innocuous and faded memory for the witnesses.

113.   Around the time of Finals Week, John Doe was instructed by Millerick that he needed to have cell service while he was studying abroad in Europe for a month between the Fall 2017 and Spring 2018 semesters. Specifically, John Doe studied in Europe from December 28, 2017, to January 29, 2018.

114.   On January 29, 2018, when John Doe returned to the United States, he received an email from Millerick stating that John Doe would not be allowed to attend his Education 598 class in person and that he would have to do so via Skype. Furthermore, John Doe was told that he would

not be allowed to attend his Math 251 (Linear Algebra) class at all, but *"arrangements would be made."* However, *"arrangements"* were never made, and John Doe was merely told that he could begin attending again a few days after classes began. Finally, Millerick stated that he had, unsuccessfully, tried to get in touch with John Doe throughout his time in Europe. However, John Doe did not have any missed calls and Millerick failed to ever email John Doe in that regard until January 29, 2018, which had previously been a primary form of communication between them.

115.    When John Doe called Millerick after receiving this email, John Doe was told that he could use Skype from a computer in the Jackson Technology Center to view his Education course beginning January 30, 2018. Although John Doe could view the class, he would not be allowed to participate and/or engage in class discussions, unlike Jane Roe, who was allowed to attend in-person, as John Doe could see her on the video. According to Millerick, if John Doe wanted to ask questions, he would have to do so outside of class hours through a system he would have to personally arrange with Professor Shahid.

116.    On February 5, 2018, John Doe received an email stating that he was allowed to attend Education 598 in-person again. John Doe would later understand that this was only because Jane Roe had dropped the class.

### E.  SEXUAL ASSAULT CHARGES AND INVESTIGATION MATERIALS

117.    On Friday, February 9, 2018, John Doe and Dr. Watkins, his faculty advocate, were called into a meeting with Millerick and Deen. During this meeting, John Doe was told that Millerick and Deen had reviewed the investigation notes and that they would be moving forward with sexual assault charges. The investigators would be Keith Larey, Director of Human Resources, and Melanie Oelfke, Assistant Director of Human Resources/ Business Affairs, but John Doe was

given no assurances regarding the investigators' qualifications to conduct an impartial investigation of the matter.

118. It was during this meeting that John Doe and Dr. Watkins were first given access to the investigators' notes from interviews and research, including notes from the interviews of A.T., a previous girlfriend of John Doe's, E.D., T.S., S.H., D.Y., A.M., B.L., J.M., another prior girlfriend, and several professors, *inter alios*. However, shockingly missing from the investigation materials were any interviews of Jane Roe's roommates, despite the investigators stating that such interviews would be important. Furthermore, on information and belief, E.P. was never interviewed and/or asked to give a statement concerning his prior experience with Jane Roe, as John Doe never saw investigative notes in that regard.

119. Notes from the interview of Dr. David Aiello, who was a close friend and professor to Jane Roe, stated that Jane Roe called him approximately two hours after the first time that Jane Roe and John Doe engaged in consensual physical intimacy on October 4, 2017. During that interaction, Jane Roe indicated to John Doe that she wanted to stop, which he immediately obliged, and Jane Roe thanked him for doing so. Dr. Aiello's statement indicated that he had to drive to Sherman to pick Jane Roe up from her house and take her back to his house because Jane Roe was so distraught. However, she would not tell Dr. Aiello the reason why. This was the first time that John Doe had heard anything about Jane Roe's alleged emotional trauma on the evening of October 4, 2017, and he questioned why she continued to pursue a consensual physical relationship with him after that date.

120. Inexplicably attached to Dr. Aiello's interview was a phone record showing that Jane Roe had called her therapist on the night of October 4, 2017. This phone record was included in the investigation book, which would be used for the misconduct hearing, without any explanation or

further inquiry. There was no evidence regarding the content of the discussions that Jane Roe, allegedly, had with her therapist, and the substance was left to the imagination of the misconduct hearing Council.

121.    Notes from the interview of Dr. Sandy Philipose indicated that Jane Roe had emailed Dr. Philipose on the night of October 11, 2017, to say that she couldn't turn in certain assignments and/or attend meetings because, in effect, *"something had happened."* Dr. Philipose responded to Jane Roe with an offer of assistance; however, Jane Roe turned down the assistance.

122.    The investigation notes from the interview of J.M., a former girlfriend of John Doe, indicated that he had never once made her feel uncomfortable during their relationship and that he was, in effect, a very sweet and caring man.

123.    However, the investigation notes from the interview of A.T., a former girlfriend of John Doe, stated that John Doe had been slightly aggressive when they were making out. When he read this, John Doe felt absolutely blind-sided and stunned, as A.T. had nothing but kind words for John Doe when they broke up and she never once indicated her discomfort during their relationship. Furthermore, John Doe and Dr. Watkins seriously questioned the context in which A.T. was interviewed and the tone of the inquiry. As such, John Doe and Dr. Watkins argued that this interview was beyond the scope of the present investigation and highly prejudicial. Eventually, Millerick agreed to remove the notes from the investigation book.

124.    The investigation notes from the interviews of S.H., T.S., B.L., D.Y., and A.M., who were attendees of the October 11, 2017, dinner at Applebee's, generally stated that Jane Roe was very fond of John Doe, even more so than he was into her, and that Jane Roe was quite obvious in her desire to leave dinner with John Doe alone. D.Y.'s testimony was, in large part, that she did not

remember the dinner very well, especially because she was not sitting near Jane Roe and John Doe at dinner.

125.    The investigation notes from John Doe's roommate, E.D., indicated that E.D. accidentally walked in on John Doe and Jane Roe while they were hooking up in John Doe's bed after dinner on October 11, 2017. Importantly, E.D.'s room was located directly across the hall from John Doe's bedroom, where Jane Roe was, allegedly, raped while she told John Doe to stop the entire time. E.D. never once heard Jane Roe tell John Doe to stop or yell for help, despite Jane Roe having knowledge that E.D. was in the house. Furthermore, E.D. also stated that he heard Jane Roe chatting and laughing with John Doe as John Doe escorted her out of the house and took her home that night.

126.    Interestingly, the investigation book contained two different versions of the text message history between Jane Roe and John Doe. Indeed, the text messages submitted to the investigators by Jane Roe were screenshots of particular portions of their conversations and largely incomplete. As a matter of fact, Jane Roe specifically omitted portions of her text message history with John Doe that related to her drug and mind-altering medication use, as well as derogatory remarks Jane Roe had made about her own faculty advocate, Dr. Catie Patterson, in an apparent attempt to gain advantage during the investigation. However, in the spirit of full-disclosure, John Doe submitted a flash drive to the investigators containing the entire text message history between himself and Jane Roe with metadata, which amounted to approximately 47 pages of text messages.

127.    The most shocking and egregious documents included within the investigation book were medical records from an examination done by Jane Roe's apparent OB/GYN a little over one week following the alleged sexual assault. The medical records were approximately three pages in length and heavily redacted throughout. The first page of the medical records included some biographical

information pertaining to Jane Roe and heavily redaction portions thereafter. However, the medical records specifically stated that *the patient was made aware that this is not a rape kit/ examination*. The second and third pages of the medical records noted, in effect: *Jane Roe presented saying she had sex recently; mood normal; affect normal; testing performed for infectious diseases was negative; findings were entirely normal except for a small, healing lesion on the left wall of her anatomy*. Beyond these findings were absolutely no subjective notes and/or medical opinions, which were likely concealed in the substantial redactions that were made. Importantly, these records did not include *any* commentary regarding whether Jane Roe had engaged in sex consensually, with whom she had sex and/or how many times she had sex recently, an explanation for the healing lesion, the context in which it had emerged, and/or the implications of such medical findings.

128.    Also included in the investigation book was a detailed statement dated October 17, 2017, concerning the incident on October 11, 2017, that Jane Roe had written specifically for the investigation with the assistance of Dr. Catie Patterson. However, the response/ defense statement to Jane Roe's detailed allegations (again, written with the assistance of Dr. Patterson), was merely the short-form complaint that John Doe had written to Michael Deen on October 14, 2017, reporting Jane Roe's harassment and false rape allegations. Importantly, John Doe's October 14, 2017, email to Deen was not written in response to Jane Roe's detailed statement of allegations, which were not levied until days later, and was not drafted with the assistance of John Doe's faculty advocate Dr. Watkins. Moreover, the inclusion of John Doe's October 14, 2017, email to Michael Deen felt like a slap in the face, as this was the first time Austin College had officially recognized his complaint.

129.    During the meeting with Millerick and Deen on February 9, 2018, John Doe and Dr. Watkins insisted that the investigators needed to interview, at least, J.S., who was Jane Roe's roommate, and P.B., who was with John Doe when Jane Roe accused him of raping her. John Doe, furthermore, asked that the investigators interview an individual E.M., who had personal knowledge of Jane Roe's chronic lying.

130.    Disturbed by the fact that the investigators had not interviewed any of Jane Roe's roommates, *inter alios*, John Doe reached out to Jane Roe's roommate, J.S., to ask whether she had any relevant information. In response, J.S. gave John Doe a lengthy statement, which included the following:

> *And hmm idk I think mostly it's the fact that she is not really stable and that she'll do things in one state of mind and then afterwards totally flip and say she felt a different way, especially when it comes to guys. In a way she almost tries to create drama and discord for herself because I thinks [sic] she likes living in crisis. She craves it, so she creates it. Even if she may not fully realize what she's doing…*
>
> *I mean not stable in the sense that one day she took a shit ton of her meds and I had to take her to the hospital so she could avoid [overdosing] . . .*

131.    When John Doe received this statement, which included more information than strictly the above, he immediately delivered the statement to Dr. Watkins. In response, Dr. Watkins emailed J.S.'s statement to Millerick on February 14, 2017, and offered for John Doe to provide screenshots to the investigators, if necessary. Dr. Watkins argued for the statement's inclusion, writing:

> *In [J.S.]'s case, this is someone who knows [Jane Roe] well who indicates a pattern of specific instability when it comes to her interaction with men . . . In a system which includes hearsay in an evidentiary way, how does one sort out the truth without considering the pattern of truthfulness of the participants?*

132.    Between February 9, 2018, and February 16, 2018, John Doe and Dr. Watkins argued with Millerick over the inclusion and exclusion of certain interviews and documentary materials that were submitted by Jane Roe and/or the investigators.

133.    On February 16, 2018, Millerick sent an email to investigators Keith Larey, Director of Human Resources, and Melanie Oelfke, Assistant Director of Human Resources/ Business Affairs, stating his final decision with regard to evidence that would be admitted at the misconduct hearing. Disturbingly, it would be Millerick, who had exhibited extreme bias against John Doe during the pendency of the investigation, that would be the gate-keeper for evidence. This felt particularly egregious because it was Millerick who made the decision to initiate the investigation, along with the Austin College Chief of Police, who was at the misconduct hearing, as well. Specifically, Millerick instructed that the investigators make alterations to the investigation book, including, but not limited to: (i) removal of the interview of S.B. and any references to him; (ii) removal of the interview of J.M. and any references to her; (iii) removal of all references to E.P.; (iv) removal of reference to John Doe's work history; (v) inclusion of the interview of P.B.; and (vi) inclusion of a special statement from Jane Roe in response to John Doe's testimony that Jane Roe told him that she was getting high, as evidenced by their text message history.

134.    During this time and before the misconduct hearing, John Doe and Dr. Watkins insisted to Millerick that a medical professional be at the misconduct hearing in order to contextualize and explain Jane Roe's highly prejudicial medical records that were not even tenuously proven to be connected to the incident. Eventually, Millerick promised to have a medical professional at the hearing in order to explain and contextualize the medical records that he had chosen to admit.

135.    On February 19, 2018, John Doe was waiting for class to begin, so he went into the hallway to fill his water bottle at the fountain. As he was filling his water bottle, John Doe was violently

body-slammed from behind into the fountain and wall, where he hit his head. As John Doe turned around to see who had attacked him, he witnessed Jane Roe walking away. Immediately, John Doe asked two male students standing nearby whether they had seen what happened. When the two men said *"yeah,"* Jane Roe immediately began to run down the hallway away from John Doe. Subsequently, John Doe filed an incident report for misdemeanor assault with the Austin College campus police, who interviewed one of the witnesses, and created a report. As of the writing of this Complaint, the investigation of this misdemeanor assault is sitting in the hands of the Sherman Police Department after being handed-off to them by the Austin College campus police some weeks following the misconduct hearing.

136.    On approximately Tuesday, February 20, 2018, John Doe had a meeting with Millerick and Dr. Watkins regarding the evidence and witness interviews that would be admitted to the investigation book. During the meeting, Millerick discussed Jane Roe's complaint that the statements of the October 11, 2017, dinner attendees were similar, which is exactly what one would expect from individuals telling the truth. However, Millerick took an accusatory tone with John Doe and, essentially, suggested that John Doe was trying to frame Jane Roe in these proceedings. During this meeting, Millerick made it obvious that he had prejudged John Doe's guilt.

137.    When John Doe requested that Jane Roe's assault of John Doe in the hallway on February 19, 2018, be included in the investigation book, Millerick yelled at John Doe and said that it would be handled as a separate matter, despite the fact that the incident was direct evidence of Jane Roe's duplicity and disregard for the existing "no contact" order.

138.    In addition, John Doe asked that his Autism diagnosis and knee injury be admitted in the investigation book, but Millerick would not allow inclusion of the Autism diagnosis purely because John Doe hadn't reported it to Austin College prior to the incident. John Doe explained to

Millerick that he had not reported his Autism diagnosis previously because he is a very private individual and did not want to be treated differently by his professors. Furthermore, John Doe wanted to admit the medical records regarding the condition of his knee at the time of the incident, which had undergone major surgery in July 2017, as evidence that would tend to show John Doe's inability to physically restrain Jane Roe during the encounter, as she alleged.

139.     In fact, John Doe injured his knee in April 2017 while playing intramural soccer, and John Doe could not walk without a brace and crutches until sometime in September 2017, after which he was only able to walk short distances and would often be in pain. John Doe expressed that he had multiple witnesses who could attest to John Doe's physical incapacities during the time of the alleged incident.

140.     Ultimately, Millerick excluded John Doe's knee and Autism diagnoses, which would have given context to the way that John Doe conducted conversation and his physical capabilities; however, Millerick had no qualms admitting Jane Roe's highly prejudicial medical records from an OB/GYN check-up approximately one week after the incident that stated, in effect, "*this is not a rape kit/ examination,*" and contained massive redactions throughout. Finally, Millerick excluded voice-recorded testimony of S.B. and E.P., which John Doe provided, regarding their prior encounters with Jane Roe and her pattern of behavior during and after physical intimacy.

**F.  THE MISCONDUCT HEARING AND AFTERMATH**

141.     On Friday, February 23, 2018, the misconduct hearing on Jane Roe's allegations against John Doe were held at Austin College. This quasi-judicial hearing was adjudicated and decided by a Council that included Defendant Michael Deen, as non-voting Chairman, and randomly chosen staff members Stephen Ramsey, Associate Professor of Business Administration, an Austin College professor, and a staff member from the international student office. No assurances were

given to John Doe regarding the qualifications, training, or experience of these individuals and/or their authority to convict him of raping Jane Roe.

142.    On February 23, 2018, mere hours before the hearing was to begin, Dr. Watkins and John Doe first learned that the procedure for the hearing was outlined in the final pages of the Austin College Student Handbook "The Environment." John Doe was shocked at this discovery, as it was Dr. Watkins, as a designated faculty advocate, who was, allegedly, trained by Austin College regarding the procedures and rules for the sexual misconduct investigation and hearing.

143.    As Dr. Watkins and John Doe read through The Environment just hours before the hearing, they discovered that both parties were supposed to submit a formal, written response to the investigation book and the materials that were included. Again, Dr. Watkins, who was a designated faculty advocate, was not aware of this requirement until the day of the hearing. Furthermore, Millerick and Deen made no attempt to receive this formal response from John Doe prior to the hearing, although they did receive the formal response of Jane Roe and admitted it for the Council to review.

144.    During the quasi-judicial hearing, during which John Doe was not represented by an attorney and not permitted to examine his own accuser, John Doe was censored by Millerick during his opening and closing statements regarding topics that Millerick deemed inadmissible, despite the fact that *"the authority to determine the relevance of information"* specifically falls to the Dean of Students, Michael Deen, in the Austin College Student Handbook. In fact, throughout the hearing and the compilation of the investigation book, Defendant Deen consistently told John Doe and Dr. Watkins that decisions on the admissibility of certain evidence would have to be determined by Millerick, who had essentially accused John Doe of attempting to frame Jane Roe, among other bias concerns.

145.    During the hearing, an Austin College police officer, who had been on the Council that decided to open the investigation and had, crucially, seen evidence that was prejudicial and inadmissible at the misconduct hearing, stated that he wanted to speak with John Doe's roommate and witness, E.D. As such, E.D. was called in and questioned, testifying that he never heard Jane Roe yell for help, he had accidentally walked-in on Jane Roe and John Doe hooking-up, and that he heard Jane Roe and John Doe laughing and chatting as they left the house that night.

146.    When the Council reconvened, they asked the parties whether they wanted to have any follow-up inquiries with witnesses. John Doe said that he would like to call T.S. in order to testify regarding the John Doe's physical condition at the time that he, allegedly, restrained and raped Jane Roe. However, this request was denied solely because, as John Doe was told, T.S. was not physically in the room at the time.

147.    When Jane Roe was given the opportunity to call witnesses, upon information and belief, Jane Roe distinctly called none. In fact, the only evidence that Jane Roe presented in support of her rape allegation was her own testimony and the highly prejudicial medical records. Importantly, despite Millerick's promise that there would be a medical professional on staff to contextualize the non-specific records for the Council, and despite the fact that Millerick and Deen had the authority to call an expert witness for this purpose, pursuant to the Austin College Student Handbook page 105, *Millerick did not secure a medical professional, and the medical records were submitted to the Council without expert explanation.*

148.    When Jane Roe and John Doe were called before the Council for questioning, Jane Roe was asked about how the situation made her feel, but John Doe was questioned about his text message that stated: *"I understand."* Confused by the differential treatment, John Doe explained

that his response was meant to be both empathetic and understanding, as he very much wanted to continue a relationship with Jane Roe at that time.

149.    The Council also asked John Doe what Jane Roe was wearing that evening, and he responded that he specifically remembered some very tight leggings, among other articles. When Jane Roe was questioned, she alleged that John Doe had removed *every article* of her clothing and that she had not participated in taking *any of the clothing* off of her body. In addition, Jane Roe claimed that John Doe had restrained her to the bed the entire time. John Doe was dumbfounded and shocked by the plain deception and impossibility of Jane Roe's contentions; indeed, Jane Roe had physically inserted John Doe's penis into her anatomy that evening.

150.    Most egregiously, the Council failed to ever ask Jane Roe why she did not cry out for help when she had actual knowledge that John Doe's roommate was in the house at the time. The Council failed to ask why Jane Roe did not file a police report and/or press criminal charges against John Doe. The Council failed to ask Jane Roe about any of her prior experiences with sexual assault and/or how those experiences may have informed her response on October 11, 2017. Finally, John Doe was not permitted to face and question his accuser.

151.    On February 26, 2018, John Doe was instructed to come to campus, where he was presented with a letter from Millerick, stating:

> *I am writing to inform you of the findings from the Student Conduct Council hearing in which you participated on Friday, February 23, 2018. The Student Conduct Council members who heard the case found you in violation of the Austin College Sexual Misconduct and Harassment Policy. Specifically, you were found in violation of sexual assault.*

152.    The Decision Letter went on to describe the severe sanctions and requirements placed on John Doe, including, as follows:

a. Suspension from the College, specifically, *"the period of [John Doe's] suspension shall be for the time during which [Jane Roe] is enrolled at Austin College or through December 31, 2018, whichever is longer. According to policy, this sanction takes effect immediately, unless you intend to appeal. Should you seek to re-enroll at Austin College upon the completion of the time period and are readmitted, you will be on probationary status."*

b. Appeal on the following bases: *"to consider new evidence that was unavailable during this hearing or due to a procedural error that adversely impacted the hearing. Appeal must be provided in writing to Dr. Sheila Pineres, Vice President of Academic Affairs, within five days from your receipt of this letter."*

c. Laughably, the Decision Letter indicated that John Doe must notify Millerick of his decision to appeal the findings *"by 5PM on February 26, 2018,"* the same date that John Doe received the Decision Letter.

d. During the period of appeal, John Doe's access to campus *"will be limited to attendance of classes and shall be under escort from Campus Police. The details of the escort will be coordinated by Mr. Millerick in conjunction with James Perry, Chief of Campus Police."*

e. Most disturbingly, as the Decision was made outside of a court of law, the Letter stated: *"This finding shall be shared with the reporter as well. The entire record of this matter shall remain on file for no fewer than seven years."*

153. Notably, the Decision Letter from Millerick included no explanation for the findings, no information regarding witness testimony, no indication as to whether an expert was provided to explain medical records, no statement regarding the investigation conducted, if any, into the veracity of Jane Roe's allegations, and/or the distinct absence of any relevant evidence to convict John Doe of, allegedly, raping Jane Roe at an off-campus location. Instead, the Decision was based solely on Jane Roe's word and in direct contradiction with the testimony of numerous witnesses, including John Doe's own word, which was apparently not worth as much as Jane Roe's. Sadly, John Doe was a victim of Austin College's policy of considering accused males guilty until they

can prove their own innocence. Furthermore, John Doe was given less than 24 hours to file a notice of appeal and approximately five days to file the appeal with Austin College.

154.    On or about March 1, 2018, John Doe was informed by Millerick that, in a reverse of course, John Doe *would not* be permitted to attend his classes during the pendency of his appeal because providing John Doe a police escort would be a strain on resources and a strain on Jane Roe.

155.    On or about March 3, 2018, John Doe submitted his appeal of the Council's decision to Dr. Sheila Pineres, along with newly-discovered and/or excluded evidence, including: (i) letters regarding his physical incapacity during time of the alleged rape from T.S., Professor Shea Regian, and Dr. Sandy Philipose, who specifically stated that John Doe's knee condition was an issue *"even while 'interim measures' were in place for a disciplinary question/issue"*; (ii) John Doe's medical records concerning his Autism diagnosis; (iii) the statement of J.S., Jane Roe's roommate; and (iv) a relevant audio recording by E.P., which was not discovered until the week of the misconduct hearing, among other items.

156.    In his appeal, John Doe contested a number of issues with unequal treatment during the underlying proceedings and investigation, including, but not limited to: (i) unequal treatment by Austin College and Millerick, in particular, following Jane Roe's provably false claims that John Doe had harassed her outside of the IDEA Center on consecutive nights in Fall 2017 and Millerick's failure to investigate/ prosecute these false claims; (ii) the unequal treatment of John Doe in Spring 2018, when Jane Roe was permitted to attend classes in-person while John Doe had to use Skype and arrange private meetings with professors if he wanted to ask questions; and (iii) the failure of Austin College and Millerick, in particular, to investigate and/or prosecute Jane Roe for the misdemeanor assault of John Doe on the Austin College campus days before the misconduct

hearing. John Doe's appeal raised further issue with procedural defects in the hearing and the investigation, including the exclusion of witness testimony regarding Jane Roe's prior similar behavior during and following instances of physical intimacy.

157.    In addition, John Doe disputed Michael Deen's censorship of John Doe during his opening and closing statements to the Council, where Deen yelled so loudly at John Doe that witnesses in the next room could hear the commotion, as there was no place in the Student Handbook that governed what the reporter and accused could say during such statements. John Doe further contested the fact that Deen and Millerick made no effort to secure a detailed response to Jane Roe's allegations, as required in the Student Handbook, and instead, merely included the October 14, 2017, email to Deen as John Doe's response, despite such email being drafted days before Jane Roe levied a formal complaint against him. When John Doe attempted to submit a detailed response to Jane Roe's allegations for inclusion before the hearing, it was denied and merely included as a response to the investigative notes, leaving his detailed statement to appear as an addendum rather than a counterpart to Jane Roe's allegations. Among other things, John Doe also contested the failure of Austin College to secure a medical expert to contextualize Jane Roe's medical records at the hearing, even after Millerick promised to do so.

158.    On March 16, 2018, John Doe was called to campus to pick up a letter written by Defendant Dr. Pineres dated March 15, 2018. The contents of the letter included a cursory and dismissive review of John Doe's points of error and appeal, ultimately deciding that she was *"upholding the decision of the Student Conduct Council."* As such, Austin College considered the case closed. Pertinently, with regard to John Doe's disputes over equal access and treatment during the investigation and hearing, Dr. Pineres wrote: *"It is beyond the scope of my authority as the appeal*

*officer to determine whether your complaints against the Reporter were handled properly by the College."*

159.    When John Doe walked in to the administrative office to pick up the letter on March 16, 2018, the secretary who gave him the letter had a look of horror and disgust on her face, saying, *"I was told that there would be police present."* It was in this moment that John Doe felt more disgusting and pained than ever before, as he was viewed by a random individual as a pervert, a rapist, and a violent criminal, who required police escort for committing a crime that he had never done and that he never had the opportunity to fight in a court of law.

160.    On information and belief, Austin College, from the outset, presumed that John Doe was guilty in order to look responsible and responsive for the Department of Education and advocates.

> a. On information and belief, the Austin College administration was cognizant of, and sensitive to, criticisms by students and the media (including on the Internet) about the manner in which Austin College resolved allegations of sexual misconduct. Indeed, during the time that John Doe was being investigated, Austin College was handling another rape investigation. As a result, Austin College's decision-makers were motivated to favor the accusing female over the accused male, so as to protect themselves and Austin College from accusations that they had failed to protect female students from sexual assault.

> b. Austin College was heavily invested in protecting female accusers even when there is no evidence of wrongdoing by males in order to avoid scrutiny from the Department of Education's Office of Civil Rights and the media.

> c. On information and belief, Austin College imposed sanctions on John Doe because it was afraid of an investigation from the Department of Education and/or a Title IX

lawsuit from the complainant, who had an alleged history with sexual assault and/or rape on a college campus.

161.    The Defendants' continued actions against John Doe are causing substantial, immediate, and continuing damages. Continued suspension from Austin College will cause John Doe to be denied the benefits of education at his chosen school, damage his academic and professional reputations, and will likely affect his ability to enroll at other institutions of higher education and to pursue a career, as Austin College could disclose the sexual assault/ rape finding to inquiring institutions. Furthermore, John Doe is faced with scholarships that he may be forced to repay as a result of no longer being in the Austin Teacher Program.

## IV.
### CAUSES OF ACTION

162.    The factual allegations contained in the preceding paragraphs are hereby incorporated and re-alleged for all purposes and incorporated herein with the same force and effect as if set forth verbatim.

### COUNT I
### DECLARATORY JUDGMENT – VIOLATION OF DUE PROCESS PROVISIONS OF THE UNITED STATES CONSTITUTION AND THE TEXAS CONSTITUTION

163.    Plaintiff repeats and incorporates all of the allegations contained in this Complaint as if fully set forth herein.

164.    This Count is brought against the Individual Defendants.

165.    The Fifth Amendment to the United States Constitution, made applicable to the State of Texas by the Fourteenth Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law."

166.    The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

167.    Article I, Section 19 of the Texas Constitution guarantees that "no citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."

168.    The Due Process Clauses of the Texas and United States Constitutions are implicated by higher education disciplinary decisions, including the disciplinary decisions under the Austin College Student Code of Conduct.

169.    Austin College has a constitutional obligation to provide a fundamentally fair and reliable hearing process.

170.    John Doe is entitled under the Constitutions of Texas and the United States to the opportunity to be heard in a meaningful manner at the Council Hearing.

171.    John Doe's interests in the results of the Council Hearing are significant.

   a.  Continued suspension from Austin College would deny him the benefits of education at his chosen school.

   b.  Continued suspension and other sanctions would also damage John Doe's academic and professional reputation.

   c.  Continued suspension and other sanctions are likely to affect the John Doe's ability to enroll at other institutions of higher education and to pursue a career.

172.    The Defendants have violated John Doe's due process rights in the following manner:

   a.  Austin College failed make contact with John Doe with regard to his complaint on October 14, 2017, and never indicated that Austin College would open an investigation into the falsity of Jane Roe's false rape allegations. Austin College failed to provide adequate time to engage the advisement of counsel and/or find a suitable faculty advocate, as John Doe was required to select an advocate in 24

hours. In particular, John Doe was not adequately advised of the procedures and policies for the Council Hearing, as his faculty advocate was not aware of the procedures outlined in The Environment until hours before the Council Hearing.

b. The Council panel members, including Defendant Chairman Deen, were biased against students accused of sexual assault.

c. Austin College administrators involved in the adjudicatory and appeal process were biased against students accused of sexual assault, specifically including Defendant Millerick, who essentially accused John Doe of trying to frame Jane Roe and suppressed relevant evidence.

d. Austin College permitted the use of hearsay evidence at the hearing without providing John Doe the opportunity to effectively cross-examine witnesses. In particular, John Doe was not permitted to cross-examine his accuser and/or the medical professional whose records Jane Roe submitted in support of her contentions at the Council Hearing.

e. John Doe was denied the effective assistance of an attorney and/or other advisor. An advisor was permitted to be present, but the advisor was not permitted to participate, and John Doe's advisor was not adequately trained in the necessary procedures, which greatly affected John Doe's ability to participate in the proceedings.

173. The Plaintiff and the Individual Defendants acting in their official capacity have a dispute about whether the Sexual Misconduct Policy and the Code of Student Conduct, as applied to John Doe, violates the Due Process Clauses of the United States Constitution and the Due Course of Law Clause of the Texas Constitution.

174.    The Individual Defendants have both a duty to enforce the provisions of the Sexual Misconduct Policy and the Code of Student Conduct and have actually enforced those provisions against John Doe.

175.    John Doe is entitled to a declaration that the Sexual Misconduct Policy and Code of Student Conduct, as applied to John Doe, violates the Due Process Clauses of the United States Constitution and the Due Course of Law Clause of the Texas Constitution.

176.    Pursuant to 42 U.S.C. § 1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

**COUNT II**
**42 U.S.C. § 1983: DENIAL OF FOURTEENTH AMENDMENT DUE PROCESS AGAINST**

177.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

178.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." In this case, Defendants are state actors subject to the Fourteenth Amendment.

179.    Section 1983 of Title 42 of the U.S. Code provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

180.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

181.   On April 4, 2011, the United States, by and through its agent the United States Department of Education, sent a 19-page "Dear Colleague" letter to colleges and universities all over the country, stating that "sexual violence" on campus was a form of "sexual harassment prohibited by Title IX" ("Dear Colleague Letter").

182.   Reversing previous federal policy, the Dear Colleague Letter threatened colleges with hundreds of millions of dollars in de-funding penalties if they did not immediately begin investigating and adjudicating allegations of campus sexual assault under detailed procedures and terms dictated by the federal government.

183.   For example, and without limitation, as a result of the Dear Colleague Letter and later statements, actions, and directives issued by the United States, colleges were as of 2016:

    a.   Required to investigate and adjudicate campus sexual assault allegations regardless of whether the complainant reported his or her allegations to the police (whereas previous federal policy had permitted colleges to allow law enforcement to handle allegations of sexual assault);

    b.   Required to establish a coordinated and centralized investigative and adjudicative procedure according to detailed rules mandated by the federal government and headed by a Title IX coordinator;

    c.   Required to protect the anonymity of students accusing another student of sexual assault if the student making the allegations so requests;

    d.   Required to apply a preponderance of the evidence standard when adjudicating such allegations (whereas previously colleges frequently applied higher evidentiary standards, such as the clear and convincing evidence standard);

    e.   Required not to allow cross-examination by the accused student;

      f.   Required or strongly encouraged to expel students that the college finds to have engaged in unconsented-to sexual intercourse with another student.

184.   Since 2011, the United States has consistently reaffirmed and adhered to the threat of substantial monetary penalties made in the Dear Colleague Letter. For example, in July 2014, former DOE Assistant Secretary for Civil Rights, Catherine Lhamon, stated that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned.

185.   Upon information and belief, since 2011, Austin College has acted in response to the federal government's threat that colleges refusing to comply would be found in violation of Title IX and be subject to extremely substantial, and in fact crippling, monetary penalties. Therefore, Austin College has a pecuniary interest in the outcome of the adjudication of sexual assault complaints, because it could lose federal money if it finds the respondent "Not Responsible." Austin College does not face the same risk of pecuniary loss if it finds the respondent "Responsible."

186.   Notably, the OCR opened an investigation at Texas A&M University in 2015, after a graduate student accused of sexual assault, found responsible, and suspended by the institution objected to what he saw as a "flawed" system. Upon information and belief, as part of their investigation, the OCR asked TAMU to respond to allegations that it showed bias against men during its disciplinary proceedings. Likewise, an investigation was opened into Baylor University in 2016, following allegations that administration had failed to properly address complaints under Title IX. These investigations are but a few that have informed Austin College's response to allegations of sexual assault and rape by students.

187.    The Dear Colleague Letter has resulted in significant action and legal consequences. Former Assistant Secretary for the Office of Civil Rights, Catherine Lhamon, recognized that: *"Our release of the 2011 DCL is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL."*

188.    Speaking at a conference on campus sexual assault held at Dartmouth College in July 2014, Lhamon also stated that despite the fact it had never been done before, she was prepared to cut off federal funding to schools that violate Title IX. She went on to describe that enforcement mechanism as part of a set of *"very, very effective tools."* Lhamon said, *"If a school refuses to comply with Title IX in any respect, I will enforce."*

189.    In fact, former Secretary Lhamon admitted: *"It's nice when you carry the big stick of the federal government."* Concerning why there is a higher volume of complaints being made to the OCR, Lhamon stated: *"I think there is more public awareness about the issue and also more confidence from survivors that we will be there for them."*

190.    Accordingly, Austin College was coerced by the United States into complying with the Title IX investigative and adjudicatory process mandated by the Dear Colleague Letter and by subsequent federal actions, statements, and directives.

191.    Austin College applied the investigative and adjudicatory process dictated to it by the federal government when it investigated and adjudicated the sexual assault complaints against John Doe.

192.    Accordingly, when Austin College investigated and adjudicated the sexual misconduct complaint against John Doe, and imposed a sanction of suspension on John Doe upon reaching

its conclusions, Austin College was a state actor and was, therefore, required to honor the rights and guarantees set forth in the United States Constitution.

193.    In the course of such investigation and adjudication, Austin College flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its repeated acts of gender bias and of deprivation of the minimal requirements of procedural fairness.

194.    Defendant  Austin College deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to: his right to a fair adjudication; his right to be informed of the exact charges against him; his right to be heard by an impartial fact finder; his right to question his accuser; his right to challenge the credibility of any adverse witnesses; and his right to present evidence and witnesses in support of his defense.

195.    As a result, Defendant Austin College failed to provide Plaintiff with the basic due process protections that they are required to provide to students accused of sexual misconduct, in violation of the Fourteenth Amendment.

196.    Based on the foregoing, Austin College was a state actor when it violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of the complaint against John Doe.

197.    As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages.

198.    Accordingly, Defendant Austin College is liable to Plaintiff for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

199.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career

opportunities, reputational damages, economic injuries and other direct and consequential damages.

200.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT III**
**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**AGAINST ALL DEFENDANTS**

201.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

202.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

203.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds. Austin College is a recipient of federal funds.

204.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

205.    The Obama Administration's DOE promulgated regulations under Title IX that require a school to *"adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by"* Title  IX

or regulations thereunder. Such prohibited actions include all forms of sexual misconduct. 34 C.F.R. § 106.8(b).

206.    Even the Obama Administration's DOE ostensibly recognized that the procedures adopted by a school, such as Defendant Austin College, covered by Title IX must accord due process to both parties involved. The practical reason why due process matters is so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts."  *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

207.    The Obama Administration's DOE recognized that there must be "[a]dequate, reliable, and impartial investigation of complaints" and that a school has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

208.    Generally, private challenges to disciplinary proceedings under Title IX manifest themselves as one of four broad theories: (1) plaintiffs claiming an "erroneous outcome" of a disciplinary proceeding, (2) plaintiffs claiming selective enforcement of university procedures to students of different sexes, (3) plaintiffs claiming deliberate indifference to sexual harassment or sexual assault on campus, and (4) plaintiffs claiming a university's actions based on archaic assumptions about the roles or behavior of men and women. *Yusuf v. Vassar Coll,* 35 F.3d 709, 715 (2d Cir. 1994) (recognizing Title IX claims for erroneous outcome and selective enforcement); *Davis v. Monroe Cty. Bd. Of Educ.,* 526 U.S. 629, 639 (1999) (recognizing liability for deliberate indifference that cause students to suffer harassment or make them vulnerable to harassment); *Pederson v. La. St. Univ.,* 213 F.3d 858, 880-82 (5th Cir. 2000) (recognizing classifications based on "archaic assumptions" are facially discriminatory and constitute

intentional discrimination in violation of Title IX). Pacheco v. St. Mary's Univ., 15-CV-1131 (RCL), 2017 WL 2670758, at *11 (W.D. Tex. June 20, 2017), appeal dismissed, 17-50635, 2017 WL 7036540 (5th Cir. Nov. 3, 2017)

209.    An "erroneous outcome" occurred in this case because John Doe was innocent and wrongly found to have committed sexual assault, and gender bias was a motivating factor.

210.    Furthermore, Defendants were deliberately indifferent to the sexual harassment that John Doe was forced to endure from Jane Roe after she initially made false allegations of rape against him. John Doe reported such allegations prior to Jane Roe's formal complaint, and he was continuously harassed by Jane Roe through the multiple false allegations that he had violated their no contact order and when John Doe was physically assaulted by Jane Roe days before his misconduct hearing. Defendants, but particularly Millerick, were deliberately indifferent to the harassment that John Doe endured from Jane Roe, and it caused him to be so paranoid on campus that he asked his friends to accompany him everywhere he went so as to not be accused of sexually harassing Jane Roe.

211.    The denial of due process and the procedural errors made in this case resulted in an "erroneous outcome" based on a flawed and distorted conception of the facts.

212.    Defendant Austin College failed to conduct an adequate, reliable,  and impartial investigation when it conducted its investigation and hearing into Jane Roe's allegations, including untimely interviews and failures to interview persons and experts with relevant knowledge.  The subsequent investigation and adjudication were further conducted in a manner that was biased against John Doe, as evidenced by the chronic bias exhibited by Millerick toward John Doe. The investigators and adjudicator were further biased by Millerick's initial, erroneous

determination that John Doe had engaged in misconduct, despite a lack of evidence or witness testimony to support Jane Roe's claims and the opening of an investigation in that regard.

213.    Austin College's treatment of John Doe's case also indicated that its policies and procedures are inherently biased against male students, when it investigated and adjudicated allegations against John Doe in a manner and degree materially different than their investigation and adjudications of allegations made against Jane Roe. In fact, upon information and belief, Austin College never opened an investigation into Jane Roe's misdemeanor assault of John Doe days before the hearing, Jane Roe's two false allegations that John Doe violated the no contact order, which was provably false, and/or John Doe's initial complaint that Jane Roe was making false rape allegations against him.

214.    Cross-examination has been recognized as the greatest legal engine ever invented for discovery of the truth, *Lilly v. Virginia*, 527 U.S. 116, 124 (1999), and has been ruled to be required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F. Supp. 136 (N.D.N.Y. 1997). Yet, in this case, Defendant Austin College relied only on the statements made by Jane Roe and her unexplained medical records, and no cross-examination was available and no sworn testimony was taken from a medical expert, in violation of due process of law. *John Doe v. University of Cincinnati*, No. 16-cv-987, 2016 WL 6996194 (S.D. Ohio Nov. 30, 2016).

215.    The totality of the circumstances establishes that Defendants acted out of gender bias in reaching the "erroneous outcome." Defendants effectively ignored his properly filed, initial complaint to Defendant Deen and failed to investigate Jane Roe's provably false allegations that John Doe violated their no contact order, and then Jane Roe proceeded to assault John Doe on campus days before the hearing. Defendants barred John Doe from fully defending himself in the investigation and adjudication process, as the Defendants refused to provide a medical expert,

refused to admit John Doe's medical diagnoses regarding his knee condition and Autism, despite their inclusion of Jane Roe's medical records that were not proven to be connected to the incident at all. After Jane Roe reported her allegations to the University, days following John Doe's complaint, Defendants sequestered John Doe, separated John Doe from his support system, required that he receive police escort and attend his classes via Skype, among other measures. Defendants found John Doe guilty for of sexual assault and imposed on him unduly harsh and unreasonable sanction, despite a serious lack of evidence, lack of witness testimony, and in the face of witness testimony to the contrary.

216.    Upon information and belief, Defendant Austin College's mishandling of John Doe's case was wrongfully affected by campus and federal pressure, as well as the investigation that was going on at the same time regarding another campus rape.

217.    The totality of circumstances establishes that Defendant Austin College has demonstrated a  pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

218.    Upon information and belief, Austin College destroyed records and evidence related to the investigation and adjudication of the sexual assault allegations against John Doe.

219.    Male respondents in sexual misconduct cases at Austin College are discriminated against solely on the basis of sex, and Austin College's training and methodologies for Title IX investigations are skewed to findings of truth for victims, even where the evidence does not support such contentions. Accused males are invariably found guilty, regardless of the evidence or lack thereof.

220.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

221.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints.

### COUNT IV
### STATE LAW BREACH OF CONTRACT AGAINST DEFENDANT AUSTIN COLLEGE

222.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

223.    Defendant Austin College created express and/or implied contracts when John Doe accepted an offer of admission to Defendant Austin College and paid the tuition and fees. Indeed, Texas law recognizes an implied and/or express contract between a private institution of higher learning and its students.

224.    Defendant Austin College breached express and/or implied contracts with John Doe.

225.    Defendant Austin College's policies provide that students are to have a fair and impartial disciplinary process in which it is the responsibility of Austin College to show that a violation has occurred before any sanctions are imposed.  Defendant Austin College breached its contract with John Doe when it failed to conduct a fair and impartial process, including not holding a hearing  regarding his allegations of false rape harassment from Jane Roe, the misdemeanor assault, and/or Jane Roe's multiple false allegations that John Doe had violated the no contact order. At no time was John Doe afforded the procedural guarantees that generally accompany a hearing, such as the right to present witnesses, experts and evidence, confront one's accuser,

and cross-examine and challenge any witnesses against him, all before an impartial and objective fact-finder. Thus, Defendants violated the contract with John Doe when they failed to afford him a proper hearing on the accusations against him.

226.     The U.S. Department of Education Office for Civil Rights requires that the excessively low preponderance of the evidence burden of proof be used to evaluate allegations of sexual misconduct. Though an inadequate standard to protect the procedural rights of accused students, Defendant Austin College utilizes this standard of review, as recognized in its Policy. Defendant Austin College violated this provision when it improperly placed the burden of proof on John Doe to prove that the accusations against him were not true and when it failed to utilize the preponderance of the evidence standard in fact in reaching the outcome.  Defendant Austin College, therefore, breached its contract with  John Doe when it failed to utilize the requisite preponderance of the evidence standard.

227.     Based on the aforementioned facts and circumstances, Defendant Austin College breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe. Defendant Austin College failed its duty of good faith and fair dealing when it meted out a disproportionate sanction notwithstanding the flawed process and lack of evidence in support of the allegations of sexual misconduct.

228.     John Doe is entitled to recover damages for Defendant Austin College's breach of the express and/or implied contractual obligations described above. As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

229.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## V.
### DEMAND FOR TRIAL BY JURY

230.    Plaintiff demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

## VI.
### PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, John Doe demands judgment against Defendants as follows:

i.      for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against Defendants awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional  and  psychological damages,  damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints;

ii.     for violation of Title IX of the Education Amendments of 1972, a judgment against Defendants awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, loss of future career prospects,  and punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints;

iii.    for state law breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and  psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

iv.     awarding John Doe such other and further relief as the Court deems just, equitable and proper.

Respectfully submitted.

/s/Susan E. Hutchison
SUSAN E. HUTCHISON
Texas Bar No. 10354100
sehservice@hsjustice.com

J. ROBERT HUDSON, JR.
Texas Bar No. 24094736
jr@hsjustice.com

HUTCHISON & STOY, PLLC
505 Pecan Street, Suite 101
Fort Worth, Texas 76102
T: (817) 820-0100
F: (817) 820-0111

**ATTORNEYS FOR PLAINTIFF**